J-S22018-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN INTEREST OF: N.D.D.G., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: D.G., FATHER | : | No. 3991 EDA 2017 |

Appeal from the Decree November 13, 2017
In the Court of Common Pleas of Philadelphia County
Family Court at No: CP-51-AP-0000285-2017

BEFORE: BENDER, P.J.E., STABILE, J., and PLATT, J.*

MEMORANDUM BY STABILE, J.:                    **FILED MAY 09, 2018**

D.G. ("Father") appeals from the decree entered November 13, 2017, in the Court of Common Pleas of Philadelphia County, which terminated involuntarily his parental rights to his minor son, N.D.D.G. ("Child"), born in February 2015.[1] After careful review, we affirm.

The trial court summarized the factual and procedural history of this matter as follows.

> . . . . The family first became known to the Department of Human Services ("DHS") on July 8, 2015 when [DHS] received a General Protective Services ("GPS") report after Mother's arrest for assault related charges. At that time, there were no relatives to care for Child. The Child was subsequently placed in foster care. An adjudicatory hearing was held on July 17, 2015 before the Honorable Judge Jonathan Irvine who adjudicated the Child

---

* Retired Senior Judge assigned to the Superior Court.

[1] The trial court continued the matter as to Child's mother, D.L. ("Mother"). It is not clear from the record whether the court ultimately terminated Mother's parental rights.

dependent. Thereafter, Mother and Child were reunited per court order.

On December 22, 2015, DHS received a GPS report alleging that the Child's mother had abandoned Child to the custody of Child's former foster parents. On December 22, 2015, DHS obtained an Order for Protective Custody ("OPC") for Child and the Child was formally placed with the Child's former foster parents. Thereafter, DHS learned that Father was incarcerated at the State Correctional Institution ("SCI") Albion . . . . On December 23, 2015, the Child was recommitted to DHS. On June 8, 2016, a Single Case Plan ("SCP") was created for Father by the Community Umbrella Agency ("CUA"). The SCP objectives for Father included (1) that Father cooperate and participate with CUA in all appropriate services; and that (2) that Father comply with all court orders.

Trial Court Opinion, 1/3/18, at 2-3 (citations to the record omitted).

On March 7, 2017, DHS filed a petition to terminate involuntarily Father's parental rights to Child. The trial court[2] conducted a termination hearing on November 13, 2017.[3] Following the hearing, the court entered a decree terminating Father's parental rights. Father timely filed a notice of appeal on December 11, 2017, along with a concise statement of errors complained of on appeal.

Father now raises the following issues for our review.

1. Whether the trial court committed reversible error, when it involuntarily terminated [F]ather's parental rights where such determination was not supported by clear and convincing evidence under the Adoption Act, 23 PA.C.S.A. §2511 (a)(1), and (2)[?]

_____

[2] While Judge Irvine presided over Child's initial dependency proceedings, the Honorable Vincent Furlong presided over the termination proceedings.

[3] Child had the benefit of both legal counsel and a guardian *ad litem* during the termination hearing.

2. Whether the trial court committed reversible error when it involuntarily terminated [F]ather's parental rights without giving primary consideration to the effect that the termination would have on the developmental, physical and emotional needs of the child as required by the Adoption Act, 23 PA.C.S.A.[] §2511(b)[?]

Father's Brief at 7.

We review Father's issues mindful of our well-settled standard of review.

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S.A. §§ 2101-2938, which requires a bifurcated analysis.

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between

parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

In this case, the trial court terminated Father's parental rights pursuant to Sections 2511(a)(1), (2), and (b). We need only agree with the court as to any one subsection of Section 2511(a), as well as Section 2511(b), in order to affirm. *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*), *appeal denied*, 863 A.2d 1141 (Pa. 2004). Here, we analyze the court's decision to terminate under Section 2511(a)(2) and (b), which provides as follows.

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> ***
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> ***
>
> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein

which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(2), (b).

We first address whether the trial court abused its discretion by terminating Father's parental rights pursuant to Section 2511(a)(2).

> In order to terminate parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003) (citation omitted). "[A] parent's incarceration is relevant to the section (a)(2) analysis and, depending on the circumstances of the case, it may be dispositive of a parent's ability to provide the 'essential parental care, control or subsistence' that the section contemplates." *In re A.D.*, 93 A.3d 888, 897 (Pa. Super. 2014) (citation omitted).

In the instant matter, the trial court found that Father is incapable of parenting Child and that he cannot or will not remedy his parental incapacity. The court reasoned that Father has been incarcerated since the beginning of Child's dependency and will remain incarcerated for the foreseeable future. Trial Court Opinion, 1/3/18, at 4. In addition, the court reasoned that there is no clear indication that Father will be able to care for Child upon his release. *Id.*

Father argues that he attempted to remedy the conditions resulting in Child's placement in foster care. Father's Brief at 10-11. Father contends that he complied with his SCP objectives during his incarceration by completing parenting classes, participating in mental health counseling, and maintaining contact with CUA. *Id.* at 15.

After carefully examining the record in this matter, we conclude that the trial court did not abuse its discretion. During the termination hearing, the court admitted into evidence a copy of Father's criminal history. *See* Exhibit DHS 9 (Secure Court Summary). Father's criminal history is extensive and dates back to 1978. *Id.* Most recently, on March 16, 2015, Father received a sentence of two to eight years' incarceration for burglary followed by five years' probation for conspiracy. *Id.* Father received no further penalty for several other convictions, including criminal trespass, criminal mischief, attempted theft by unlawful taking, and attempted receiving stolen property. *Id.*

CUA case manager, Taisha Shaw, testified that Father has remained incarcerated throughout Child's life. N.T., 11/13/17, at 21-22. While incarcerated, Father maintained contact with CUA, participated in SCP meetings, and completed life skills and mental health coping skills classes.[4]

_____

[4] Ms. Shaw attempted to testify that Father completed violence prevention and domestic violence classes. N.T., 11/13/17, at 29. However, Father's counsel objected to hearsay, because the testimony derived from statements by Father's prison social worker. *Id.* at 29-30. The trial court sustained the objection. *Id.* at 30. Father testified later that he completed a "batter's [*sic*] class." *Id.* at 44, 54.

*Id.* at 30, 33. However, Ms. Shaw was uncertain when Father would be released, or where Father would live after his release. *Id.* at 24, 27, 30-31. She also expressed concern that Father may have a history of domestic violence. *Id.* at 28-29. Mother alleged to Ms. Shaw that Father physically and mentally abused her during their relationship. *Id.* at 29.

The trial court also heard testimony from Father, who disputed the severity of his criminal history. *Id.* at 42. He insisted, "I wasn't actually locked up my whole life. What I did I got caught up with cases that somebody else did, but me not being a person who would tell I ended up doing the time." *Id.* Father testified that he would be paroled in January 2018. *Id.* at 43. Concerning his housing situation, Father testified that he could stay with his brother, but that he would be attending a reentry program that would assist him in finding his own home instead. *Id.*

Thus, the record confirms that Father is incapable of parenting Child. Moreover, Father cannot or will not remedy his parental incapacity. Father has been incarcerated throughout Child's life. Even assuming that Father was paroled in January 2018, it is doubtful that he will be able to avoid further criminal activity and provide Child with a stable home at any point in the foreseeable future. As this Court has emphasized, "a child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of

progress and hope for the future." ***In re Adoption of R.J.S.***, 901 A.2d 502, 513 (Pa. Super. 2006).

We next consider whether the trial court abused its discretion by terminating Father's parental rights pursuant to Section 2511(b).

> Section 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. As this Court has explained, Section 2511(b) does not explicitly require a bonding analysis and the term 'bond' is not defined in the Adoption Act. Case law, however, provides that analysis of the emotional bond, if any, between parent and child is a factor to be considered as part of our analysis. While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.
>
> > [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

***In re Adoption of C.D.R.***, 111 A.3d 1212, 1219 (Pa. Super. 2015) (quoting ***In re N.A.M.***, 33 A.3d 95, 103 (Pa. Super. 2011) (quotation marks and citations omitted).

In this case, the trial court concluded that terminating Father's parental rights would best serve Child's needs and welfare. The court reasoned that Child has a parent/child bond with his foster parent, but has no bond with Father. Trial Court Opinion, 1/3/18, at 6-7.

Father argues that CUA failed to facilitate his request for visitation with Child. Father's Brief at 11, 14. Father contends that CUA failed to arrange "virtual visitation" with Child while he was incarcerated at SCI Albion, and failed to arrange an in-person visit while he was incarcerated in Philadelphia. *Id.* at 14. In addition, Father argues that CUA presented only speculative evidence concerning the effect that terminating his parental rights would have on Child. *Id.* at 16.

We again discern no abuse of discretion. Ms. Shaw testified that Child has never seen Father, nor has he spoken to him on the phone. N.T., 11/13/17, at 22-23, 26. Because SCI Albion is approximately eight hours away, Judge Irvine ordered that Child would not have visits with Father. *Id.* at 22-23. Ms. Shaw testified that she attempted to arrange "virtual visitation" with two providers, but was unable to do so.[5] *Id.* at 23, 34-35. She recalled that Father was transferred back to Philadelphia in June 2017. *Id.* at 36. However, by the time she arrived with Child for a visit, Father had already returned to SCI Albion. *Id.*

Ms. Shaw further testified that Child has lived with the same pre-adoptive foster parent since April 2016. *Id.* at 24-25, 27. This is "[p]ossibly

_____

[5] On cross-examination by Father's counsel, Ms. Shaw explained that she was unable to arrange "virtual visitation" with one provider because "I needed them to email me or send me something on paper detailing what the cost was of the services. And that did not happen." N.T., 11/13/17, at 35. She was unable to arrange "virtual visitation" with the second provider because "when I presented the information to my supervisor we were to follow up and that follow up occurred, but at that time it was earlier in the case and it wasn't able to be set up through them." *Id.*

the third time" Child has been placed in that home. *Id.* at 25. Ms. Shaw believed that Child has a strong bond with his foster parent because he refers to her as "mom" and refers to her boyfriend as "papa." *Id.* at 26.

Ms. Shaw concluded that there would not be any long-term detrimental effect on Child if the trial court terminated Father's parental rights. *Id.* at 32. She explained, "I believe that [Child's] bond with his caregivers is strong. That [Child] has been stable with them despite his moving around in the systems. [*sic*] And I do believe that it would be in his best interest mentally to remain where he's at and not to disrupt that placement." *Id.*

Thus, the record supports the trial court's conclusion that terminating Father's parental rights would best serve Child's needs and welfare. Child has never even met Father. It is clear that Child has no bond with Father and will not suffer irreparable harm if the court terminates Father's parental rights. Child has a strong bond with his foster mother, who stands ready to adopt him into a permanent and stable home.

In reaching this conclusion, we reject Father's argument that CUA failed to facilitate his request for visitation. To the extent Father contends that CUA failed to provide reasonable reunification efforts, it is well-settled that such efforts are not necessary to support termination of parental rights pursuant to Section 2511(a)(2) and (b). *See In re D.C.D.*, 105 A.3d 662, 672 (Pa. 2014). Moreover, Father has only himself to blame for becoming incarcerated and impairing his ability to exercise visits. Even if CUA had succeeded in

establishing "virtual visitation," it is highly unlikely that Child would have developed a bond with Father under the circumstances.

Based on the foregoing, we conclude that the trial court did not abuse its discretion by terminating Father's parental rights involuntarily. Therefore, we affirm the court's November 13, 2017 order.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 5/9/18